# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                          No.13-CR-01874 MV

ROBERTO THOMAS,

      Defendant.

---

*Appearances:*
*For the United States:*            *For the Defendant:*
DAMON P. MARTINEZ           TODD BRUCE HOTCHKISS
United States Attorney           TODD B. HOTCHKISS, LLC
201 3rd Street NW             610 Gold Avenue SW
Suite 900                    Suite 228
Albuquerque, NM  87114       Albuquerque, NM 87102

*By:* JOEL MEYERS
Assistant United States Attorney
SHAHEEN P. TORGOLEY
Assistant United States Attorney

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Roberto Thomas's Motion for New Trial, timely filed on May 6, 2016 [Doc. 222].  The United States filed an untimely response on May 23, 2016 [Doc. 224], and Mr. Thomas timely replied [Doc. 226].  In his Reply, Mr. Thomas moved to strike the untimely United States Response [Doc. 226, at 1].

The Court, having considered the Motion, briefs, relevant law, and being otherwise fully informed, finds that the Motion for a New Trial is well taken and will be **GRANTED**.  The Motion to Strike the United States' Response is therefore moot, and will be **DENIED**.

**BACKGROUND**

This case involves the takedown of a network of methamphetamine distributors and dealers centering on Jesus Amaya.  By the time of trial, essentially all of the principals to Mr. Amaya's drug conspiracy had pled guilty.  *See, e.g.*, Doc. 104, J.C. Plea Hearing; Doc. 113, C.T. Plea Hearing; Doc. 148, J.A. Plea Hearing.  The United States decided to proceed with the prosecution of the sole remaining defendant, Roberto Thomas, an alleged accomplice and occasional lookout for Juan Caballero, who was one of Mr. Amaya's couriers.  The United States charged Mr. Thomas with knowingly possessing methamphetamine with the intent to distribute it.  Doc. 201, Superseding Indictment.  The United States also indicted Mr. Thomas as a participant in the mehtamphetamine conspiracy, but was forced to drop this charge based on a lack of evidence.  *See* Doc. 214, Clerk's Minutes.

## I.      DEA Investigation and Pre-Trial Rulings

Prior to the prosecution and conviction of Mr. Amaya and his co-conspirators, the United States Drug Enforcement Administration ("DEA") had conducted an extensive investigation of Mr. Amaya's illegal business activities which included the use of a confidential informant.  *See generally* Doc. 92, Opp. to Suppression Motion, at 1–2 (describing background investigation).  Before the day of his arrest, Mr. Thomas had apparently never been implicated by the DEA investigation of Mr. Amaya and his illicit business.  Trial of Roberto Thomas, April 20, 2016, at 2:56.  Furthermore, one of Mr. Thomas's alleged co-conspirators explained under oath at a

closed pre-trial proceeding that Mr. Thomas was not involved in the alleged conspiracy and had no knowledge of the drug transaction that occurred on the day of Mr. Thomas's arrest. *See* Doc. 206, Clerk's Minutes (documenting conference re potential *Brady* issue). Perhaps for this reason, counsel for the United States made the tactical decision not to present at trial any of the evidence it had obtained regarding events prior to the date of Mr. Thomas's arrest, including co-conspirator testimony and the results of the DEA investigation, and decided instead only to present evidence obtained from the events that occurred on the day of Mr. Thomas's arrest. Doc. 207, Order Re Hearsay, at 1–2 (summarizing the evidence the government represented to the Court that it did not intend to introduce).

Given the concern that the United States would perhaps inadvertently attempt to solicit testimony regarding the larger DEA investigation, Mr. Thomas moved in limine to limit the hearsay and speculative testimony of witnesses for the United States – essentially forcing the prosecution to commit to its apparent strategy. Doc. 190, MIL Re Hearsay; Doc. 191, MIL Re Speculation. Before trial, the United States presented its witness list, which indicated that the United States did not intend to present any co-conspirator testimony, confidential informant testimony, or other witnesses that could tie Mr. Thomas to the conspiracy. *See* Doc. 181, United States Witness List (listing only arresting and interrogating officers as witnesses). The United States' proposed exhibit list contained a mere four exhibits, all of which pertained to the events on the day of Mr. Thomas's arrest and none of which appeared to link Mr. Thomas to the alleged conspiracy. *See* Doc. 179, United States Exhibit List. Responding to Mr. Thomas's motions in limine, the United States fully admitted that it did not intend to introduce any evidence tying Mr. Thomas to the alleged conspiracy other than the fact that he was arrested on the same day at the

same location as the co-conspirators. Doc. 192, Opp. to MIL Re Hearsay, at 3–7; *see* Doc. 207, Order Re Hearsay, at 1–2.  Instead, the United States argued that any testimony regarding the investigation into the larger drug conspiracy, which did not appear to produce any evidence implicating Mr. Thomas, would not be offered "for the truth of the matter asserted" and would instead only be offered to contextualize "the progression of the investigation and surveillance[.]" Doc. 192, Opp. to MIL Re Hearsay, at 3–7.

The Court granted in part Mr. Thomas's motions and expressed concern regarding the prosecution's decision not to present any evidence that directly tied Mr. Thomas to Mr. Amaya's illegal methamphetamine business, including any evidence that Mr. Amaya or the other co-conspirators were even aware of Mr. Thomas's existence.  *See* Doc. 207, Order Re Hearsay, at 1–7; Doc. 208, Order Re Speculation.  The Court specifically cautioned the United States that "[b]ased on the government's representations, the Court will not address the admissibility of [testimony regarding Mr. Amaya's illegal methamphetamine business prior to the distribution of methamphetamine scheduled for the day of the arrest], but does caution the government that, should it decide at any point to introduce such testimony, it must first seek permission from the Court to do so." Doc. 207, Order Re Hearsay, at 1–2.  The Court further excluded as testimonial hearsay in violation of the Confrontation Clause and the Federal Rules of Evidence any testimony that was not based on first-hand knowledge of the drug investigation and was instead premised on confidential informant testimony that would not be presented in Court.  Doc. 207, Order Re Hearsay, at 1–9 (relying on extensive Tenth Circuit precedent).

Furthermore, relying on representations by the United States that arguments inferring guilt from Mr. Thomas's flight would not be elicited, the Court specifically declined to rule on

4

whether the United States could rely on evidence of Mr. Thomas's flight from a vehicle on the day of his arrest to prove Mr. Thomas's mental state regarding the offenses charged.  Doc. 208, Order Re Speculation, at 1–2 (declining to rule on the issue based on representations that the government would not attempt to argue that "'people typically don't flee' after vehicle accidents.").  Again, the Court specifically declined to rule on the issue, stating that "[b]ased on the government's representations, the Court will not address the admissibility of [evidence inferring guilt from Mr. Thomas's flight], but does caution the government that, should it decide at any point to introduce such testimony, it must first seek permission from the Court to do so." *Id.*

The Court also ordered a telephonic status conference prior to trial to further understand the unusual decisions made by counsel for both parties regarding the decision not to present substantive evidence in support of the conspiracy charge, including co-conspirator testimony from the alleged co-conspirators that had pled guilty and were awaiting sentencing.  *See* Doc. 206, Clerk's Minutes re Status Conference.

## II.    Evidence Presented at Trial

The evidence presented at trial was as follows:

1.  In 2013, Mr. Thomas worked for a man named Juan Caballero at an auto shop. Trial of Roberto Thomas, April 21, 2016, at 3:08–09 pm.

2.  On May 8, 2013, Juan Caballero's GMC El Caballero contained 1.334 kg of methamphetamine.  The methamphetamine was found wrapped in cellophane near the center console of the El Caballero inside a rumpled, nondescript brown paper bag.  Trial of Roberto Thomas, April 21, 2016, at 10:11–12 am.

3. Mr. Thomas was a passenger of Juan Caballero on May 8, 2013 when Juan Caballero was arrested.  Trial of Roberto Thomas, April 21, 2016, at 11:05 am.

4. The arrest was conducted by force.  An unmarked police vehicle rammed Mr. Caballero's El Caballero, whereupon Mr. Thomas and Mr. Caballero fled the El Caballero and the police gave chase.  Many of the United States' witnesses were suspiciously unable to recall the details regarding police ramming of the El Caballero, but recalled with remarkable clarity the details of the foot chase and actual arrest.  Trial of Roberto Thomas, April 20, 2016, at 2:34–2:55 pm; 3:18–3:40 pm; 4:20–25 pm; Trial of Roberto Thomas, April 21, 2016, at 10:00–10:29 am.  Both parties spent an inordinate amount of time litigating this series of events, although the Court did not find either of the events particularly useful in assessing whether Mr. Thomas was guilty of possessing methamphetamine with the intent to distribute it.

5. Mr. Thomas was arrested and, eventually, Mirandized and interrogated by Officer Davis.  Trial of Roberto Thomas, April 21, 2016, at 2:42–43 pm.  Officer Davis was not involved in the arrest of Mr. Thomas and appears to have been otherwise uninvolved in the investigation.  *See id.* at 2:55 pm (stating that Officer Davis did not know why Mr. Thomas was arrested but that he "knew it was drug related" and that he "just conducted the interview.").

6. Mr. Thomas allegedly confessed to Officer Davis during police interrogation that he had previously received money "off the books" from Mr. Caballero by acting as a lookout and that he believed that Mr. Caballero was a dealer of narcotics, potentially marijuana.  Trial of Roberto Thomas, April 21, 2016, at 2:53–55 pm; 3:16 pm (summarizing the

results of the interrogation and mentioning a belief by Mr. Thomas that Mr. Caballero was a marijuana dealer).  Despite clearly wanting to assist the prosecution through his testimony, Officer Davis could not state whether Mr. Thomas mentioned any knowledge of the alleged drug transaction on the day of the arrest, and the interrogation produced no knowledge on behalf of Mr. Thomas of any particular drug transaction within the scope of the conspiracy.  *See, e.g., id.* at 3:13 pm.  Officer Davis was able to recall on the stand that Mr. Thomas admitted that Mr. Caballero placed a brown paper bag into Mr. Thomas's control moments before the arrest, thus, potentially, satisfying the possession element of the offense.  However, this statement was never documented in the police report made of Mr. Thomas's interrogation and Officer Davis had never mentioned this important statement in any of his prior testimony in this case.  *Compare id.* at 2:54–56, 3:11 (Officer Davis remembering these facts), *with* doc. 125, Tr. of Suppress. Hearing, at 145–65 (omitting these facts).

7.  No actual recording, transcript, or notes of this interrogation were taken at the time the interrogation occurred.  Trial of Roberto Thomas, April 21, 2016, at 2:55–56 pm.  The sole memorialization of this interrogation is a written police report drafted several days after the interrogation occurred.  The report was drafted by Officer Davis, who was unfamiliar with the investigation, and then revised by Agent Lemon, a case manager familiar with the investigation, but not present during the interrogation.  *Id.* at 2:56.  As explained in more detail below, the Court finds the results of this interrogation to be unreliable and, even if the Court had found the results of the interrogation to be reliable,

the results appear to be probative of the United States' case only if strong inferences are drawn in the United States' favor.[1]

8. Agent Lemon, the case agent in this trial, offered testimony regarding the role a lookout would play for a courier based on his experience investigating narcotics cases.  Trial of Roberto Thomas, April 20, 2016, at 4:30–37 pm.  The United States offered no evidence regarding what Mr. Thomas actually did as an alleged lookout for Mr. Caballero, the role Mr. Thomas allegedly confessed to having performed for Mr. Caballero during some unspecified marijuana transactions prior to the arrest.  Agent Lemon was never certified as an expert in this area and never offered an opinion regarding whether Mr. Thomas was actually acting as a lookout in this case or whether anyone ever observed Mr. Thomas acting in that role in this case.

9. The United States presented extensive evidence that its primary witness, Agent Hella, who arrested Mr. Thomas, was a "track star" at the University of New Mexico and experienced at chasing down criminals on foot.  Trial of Roberto Thomas, April 21, 2016, at 2:16–17 pm, 3:02–05 pm, 3:10–14 pm; *see* Doc. 221, Transcript of Proceedings, at 7–8 (highlighting this fact in closing argument).  At one point, Agent Hella appeared to become embarrassed at the repeated questions regarding his athletic records at the University of New Mexico Athletics Department and his experience running down criminals.  Trial of Roberto Thomas, April 21, 2016, at 3:10 pm.

---

[1] The United States acknowledged the relative weakness of the results of this interrogation in its rebuttal to Mr. Thomas's closing argument by asserting that it was unlikely that the results of the interrogation were fabricated by Officer Davis despite the lack of record keeping because any intentionally falsified documents would have produced clearer statements of culpability by Mr. Thomas.  Doc. 221, Transcript of Proceedings, at 37.

10. The vast majority of the United States evidence in the case was directed toward the foot

chase and arrest of Mr. Thomas.  The United States' description of Agent Hella's arrest

of Mr. Thomas was colorful and lengthy, and was told through the perspective of several

different witnesses.  *E.g.*, Trial of Roberto Thomas, April 20, 2016, at 2:34–2:55 pm;

3:18–3:40 pm; 4:20–25 pm; Trial of Roberto Thomas, April 21, 2016, at 10:00–10:29

am.  It was the subject of direct examination, cross-examination, and re-direct, as well as

questions directly from the Court.  *Id.*  However, it appears that the chase itself lasted

only 20 seconds.  Trial of Roberto Thomas, April 20, 2016, at 4:21 pm.  At several

points, the United States asked Agent Hella to explain in more vivid detail how he

eventually caught up with and subdued Mr. Thomas.  *E.g., id.* at 3:18–3:40 pm; 4:20–21

pm.  Agent Hella's chase of Mr. Thomas was in many ways the "climax" of the

prosecution's presentation, and after the trial several jurors approached the witness for

the United States to eagerly discuss the details of the arrest, including an enthusiastic

discussion of the firearms Agent Hella was carrying when he subdued Mr. Thomas.  The

Court has repeatedly noted to counsel that "it does not find this [foot chase] remarkable

or suspicious," despite it being the apparent centerpiece of the prosecution's case.  *See,*

*e.g.,* Doc. 134, Order on Suppression, at 3–5, *reconsidered on other grounds*, Doc. 169.[2]

In short, the <u>relevant</u> evidence presented at trial may be summarized as follows:  Mr.

Thomas was arrested on May 8, 2013 after fleeing from a car crash.  Upon investigation of the

crash, a DEA taskforce discovered a quantity of methamphetamine too large to be for personal

---

[2] This Court previously ruled that the United States had not been able to establish, on presentation of similar
evidence, that Mr. Thomas was aware prior to his arrest that he was being pursued by law enforcement rather than
some unknown third party.  Doc. 134, Order on Suppression, at 3–5, *reconsidered on other grounds*, Doc. 169.  The
Court further ruled that Mr. Thomas immediately complied with the commands of law enforcement when he became
aware that he was being pursued by law enforcement.  *Id.*

use.  Mr. Thomas was the passenger in the crashed vehicle and Mr. Caballero was the driver.

After the arrest, Mr. Thomas was interrogated.  Although Mr. Thomas allegedly confessed to

being involved in some previous, unspecified marijuana transactions with Mr. Caballero, Mr.

Thomas did not confess to any involvement in a drug transaction on the day of his arrest, any

involvement in any specific transaction conducted by the conspiracy, or any transactions

involving the substance that was the target of the DEA investigation.  During Mr. Thomas's

alleged confession, Mr. Thomas was not able to identify the substance that the conspiracy dealt

in, methamphetamine, and Mr. Thomas had never been implicated in any DEA investigation

before his arrest.

### III.   Errors Regarding the Presentation of Evidence

During the trial, witnesses for the United States repeatedly referred to the larger

investigation into Jesus Amaya's illegal narcotics business despite the United States' decision

not to lay the foundation for that testimony, present witnesses to speak about the larger

investigation, present any physical evidence resulting from that larger investigation, or present

evidence tying Mr. Thomas to Mr. Amaya's illegal narcotics business.  Doc. 223, Partial

Transcript of Proceedings, at 1–37 (extended hearing regarding evidence presented in violation

of the Court's orders).  Some of this testimony was directly solicited by counsel for the United

States, while at other times this testimony was offered inadvertently by eager witnesses.  Doc.

223, Partial Transcript of Proceedings, at 14 (ruling that the United States did elicit some of the

unlawful testimony).  This testimony violated the Court's orders in limine and the Federal Rules

of Evidence and was erroneously admitted.  Doc. 223, Partial Transcript of Proceedings, at 24.

The first day of trial, counsel for Mr. Thomas at one point objected to the wrongly admitted

testimony and was erroneously overruled by the Court.   Doc. 223, Partial Transcript of Proceedings, at 25–27.   Never was the Court approached to discuss any of this testimony before it was presented, even though the Court had specifically "caution[ed] the government that, should it decide at any point to introduce such testimony, it must first seek permission from the Court to do so." Doc. 207, Order Re Hearsay, at 1–2.

At the end of the first day of trial, the Court informed counsel that numerous violations of the Court's orders in limine had occurred and explained that the Court would hold a hearing on the matter the following morning to decide what to do about the violation.   Doc. 223, Partial Transcript of Proceedings, at 1–7.   The Court spent the night thoroughly reviewing the transcript from the earlier proceedings.   *Id.*

The following morning, Mr. Thomas moved for a mistrial and the United States opposed the motion.   Doc. 223, Partial Transcript of Proceedings, at 29.   The Court allowed the parties to vigorously debate the mistrial motion in the Courtroom.   Doc. 223, Partial Transcript of Proceedings, at 29–35.   The Court also heard from counsel regarding the matter off the record. Against the Court's better judgment, the Court denied the mistrial motion and presented a limiting instruction to the jury.   *See* Doc. 223, Partial Transcript of Proceedings, at 35– 36; Doc. 212, Order Denying Mot. for Mistrial.   Because the government's witness list indicated that it had no evidence to support the conspiracy charges, shortly after the Court denied the mistrial motion, the United States moved to dismiss, with prejudice, the conspiracy charge against Mr. Thomas, electing to only proceed on the charge of possession with the intent to distribute.   *See* Doc. 223, Partial Transcript of Proceedings, at 34.   The Court now believes that its failure to grant the mistrial motion was in error.

Subsequent to the Court's emergency hearing regarding its Order on hearsay issues on the second day of trial, the United States proceeded to its case in chief against Mr. Thomas. The United States presented evidence that the car in which Mr. Thomas was a passenger contained methamphetamine and that Mr. Thomas's flight from the car evinced a "guilty mind" on behalf of Mr. Thomas sufficient to establish the requisite *mens rea* for the possession with intent to distribute methamphetamine charge. *See* Doc. 221, Transcript of Proceedings, at 3–4, 15–16 (elaborating in closing argument the government's theory of the case). Mr. Thomas had moved in limine to exclude this *mens rea* testimony. Doc. 191, MIL Re Speculation. The Court never ruled on this evidence or closely examined the legal principles at issue relying on the representations by the United States that the theory would not be pursued. *See* Doc. 208, Order Re Speculation, at 1–2, 7 (summarizing the representation by the United States that it would not attempt to argue that "'people typically don't flee' after vehicle accidents."); Doc. 193, Opp. to MIL Re Speculation, at 4 (responding to Mr. Thomas's motion on that issue).

### IV.  Errors in Closing Arguments and Post-Trial Errors

The United States' closing argument focused primarily on Agent Hella's allegedly remarkable pursuit and arrest of Mr. Thomas. The United States began its closing argument with "Two words: Why run?" and concluded its closing argument with "why did he run? Why did he continue to run?" Doc. 221, Transcript of Proceedings, at 3–4, 15–16. The Court specifically declined to rule on the permissibility of this line of argument because before trial the United States had represented to the Court that it would not proceed on this theory, stating multiple times that "the United States will not elicit this testimony in its direct examination of any of its witnesses." Doc.193, Opp. to MIL Re Speculation, at 4–5. The Court was never approached

regarding this line of argument at any time, even though the Court had specifically "caution[ed] the government that, should it decide at any point to introduce such testimony, it must first seek permission from the Court to do so." *Id.* at 1–2.

Contrary to the United States' previous representations to the Court, the central point in the United States' closing argument was that the jury should infer, beyond a reasonable doubt, that Mr. Thomas was running from Agent Hella because he knew that he was about to be arrested for knowingly possessing methamphetamine with the intent to distribute it and was therefore guilty of the same offense. *E.g.*, Doc. 221, Transcript of Proceedings, at 3, 7, 14–16 ("The occupants of the vehicle, do they decide to stick around and say, 'Hey, you bumped into me, buddy, let's exchange insurance. Kind of a little accident, sorry about the fender bender. I have Geico, you have Nationwide, let's' – no."). The United States pursued this argument despite the Courts previous concerns regarding the inferential leaps the United States was asking the jury to take and after representing to the Court before trial that it would not attempt to argue that "'people typically don't flee' after vehicle accidents." Doc. 208, Order Re Speculation, at 1–2, 7. The Court specifically did not address in limine Mr. Thomas's arguments regarding the testimony on which the government's closing argument was based because it relied on the United States' representation that the point would not be argued. *Id.*

The United States also presented a rebuttal to Mr. Thomas's closing that focused on Mr. Thomas's failure to make exculpatory statements to law enforcement that would explain his conduct:

> We asked Agent Hella, He make any [exculpatory] statements? No[: "]Gee, thank goodness you're the police. I thought there were these crazy bandits in 12 cars coming at me to kill me in the middle of the desert, which I have no reason to explain to you why I was there in the first place because I work at an autodetailing

business and I'm not doing detailing out at the dump. . . .  Thank god the police are here, I thought I was going to be killed.["]

What happens when he goes back to the Albuquerque District Office [for interrogation]?  Guys, this was a crazy misunderstanding.  I thought I was going to get killed.  There was this crazy bag that got thrown on my lap . . .  I don't know about anything.  I'm so glad that you're here, I thought I was going to be killed.

That's not what happened.

Doc. 221, Transcript of Proceedings, at 39–40.

Although some of these statements were the subject of Mr. Thomas's motions in limine, including the post-arrest statements of Mr. Thomas, the hearsay statements of the United States' witnesses, and the statements made regarding Mr, Thomas's motive for flight, Mr. Thomas never objected to the statements made in the prosecution's closing.  *Compare*, Doc. 190, MIL re Hearsay and Doc. 191, MIL re Speculation, *with* Doc. 221, Transcript of Proceedings.  Mr. Thomas also never objected in trial – rather than in limine – to the vast majority of the evidence admitted in violation of the Court's orders in limine and contrary to the previous representations by the United States.  Doc. 223, Partial Transcript of Proceeding, at 28 (counsel for Mr. Thomas stating that he "had a very difficult drive home last night [because of his failures to timely object]"); *see* Doc. 222, Mot. for New Trial, at 3 (asserting counsel's failure to object as grounds for a new trial).  Instead, counsel for Mr. Thomas presented a series of rote cross-examinations regarding the inconsistencies in various witnesses' testimonies and the failure on behalf of the United States to document the one piece of direct evidence the government presented – Mr. Thomas's vague and internally inconsistent interrogation by an otherwise uninvolved police officer.  Counsel for Mr. Thomas then presented a highly technical closing argument about the weaknesses in the government's case. Doc. 221, Transcript of Proceedings, at 17–33.

14

DISCUSSION

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33(a).[3]  The rule "recognizes that if a trial court concludes for <u>any</u> reason that the trial has resulted in a miscarriage of justice, <u>the court has broad powers to grant a new trial</u>."  CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 581 (4th ed. 2016) (hereinafter "FEDERAL PRACTICE AND PROCEDURE") (emphasis added); *United States v. Mann*, 982 F. Supp. 2d 1251, 1259 (D.N.M. 2013) (Rule 33 motion may be grounded on any reason, "including improper jury instructions.").  Rule 33 presumes that the verdict rendered by the jury is valid, and the burden therefore rests on the moving party to show that a new trial ought to be granted.  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

There are three different ways a defendant may assert a Rule 33 challenge: (1) a challenge to the verdict as against the weight of the evidence; (2) a challenge to the conviction for trial error or pretrial error; or (3) a challenge to the verdict based on newly discovered evidence.  FEDERAL PRACTICE AND PROCEDURE at § 24.11(b).  The same "interest of justice" standard applies to all three theories.  FED. R. CRIM. P. 33 ("the court may vacate any judgment and grant a new trial if the interest of justice so requires.")  However, Rule 33 "does not define

---

[3] The general rule is that only the defendant may move for a new trial under Rule 33.  *United States v. Wright*, 363 F.3d 237, 248 (3d Cir. 2004).  This is perhaps because, under the Double Jeopardy Clause of the Constitution, only the defendant may waive her right to the finality of the verdict.  *See Gori v.United States*, 367 U.S. 364, 370 (1961) (discussing the appropriateness of a trial court's *sua sponte* order of a mistrial and subsequent new trial).  As a result of the division of opinions among appellate courts regarding a trial court's ability to consider the interests of justice on its own initiative, appellate courts are divided about the scope of the a trial court's discretion to consider additional arguments not raised on a Rule 33 motion.  *See United States v. Nguyen*, 507 F.3d 836, 839 (5th Cir. 2007) (noting potential division regarding this issue among the Courts of Appeals).  The Court takes no opinion on this discussion here and bases its ruling solely on the grounds asserted in Mr. Thomas's motion.  Doc. 222, Mot. for New Trial, at 1–3.

'interests of justice' and the courts have had little success in trying to generalize its meaning." *United States v. Green*, 2012 WL 12023805, at *3 (D.N.M. Feb. 14, 2012) (citations omitted). While the Eleventh Circuit has stated, "the interest of justice standard is broad enough to cover circumstances where the alleged defect does not constitute a reversible error[,]" *United States v. Vicaria*, 12 F.3d 195, 198–99 (11th Cir. 1994), the Court considers here only error that it believes would warrant reversal on appeal. *Cf. United States v. Walters*, 89 F. Supp. 2d 1206, 1213 (D. Kan. 2000) ("for purposes of this case, the relevant rule is that a new trial should be granted upon any error of sufficient magnitude to require reversal on appeal.") (quotations omitted), *aff'd*, 28 F. App'x 902 (10th Cir. 2001).

While the standard elaborated by the Tenth Circuit imbues the trial court with significant discretion, it is well established that a "motion for a new trial is not regarded with favor and should only be granted with great caution." *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997). Although appellate courts have cautioned trial courts against granting a Rule 33 motion, the Court is also aware of the dangers of being too cautious, and appellate courts across the United States have noted that trial courts "should grant a new trial whenever the interest of justice requires it." *United States v. Munoz*, 605 F.3d 359, 374 (6th Cir. 2010); *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) ("When the concern rises to the level of the belief that somebody innocent has been convicted, the trial court should grant a motion for a new trial."); *United States v. Warren*, 593 F.3d 540, 544–545 (7th Cir. 2010) (same); *United States v. Scroggins*, 379 F.3d 233 (5th Cir. 2004) (district court may grant new trial in the interest of justice even if it does not find that a specific legal error occurred at trial), *vacated on other grounds*, 543 U.S. 1112 (2005).

Here, Mr. Thomas has asserted 11 different "grounds" for granting a Rule 33 motion without explaining on which prong of Rule 33 any of his challenges rest.  Doc. 222, Mot. for New Trial, at 1–3.[4]  This Order proceeds by first establishing the standard of review under Rule 33 and then addresses Mr. Thomas's grounds below collectively as either: (1) challenges to the verdict as against the weight of the evidence or (2) challenges to the conviction for error that would justify reversal of a conviction on appeal.  *See* FEDERAL PRACTICE AND PROCEDURE at § 24.11(b) (categorizing these as two of the most common means of challenging a verdict under Rule 33).  The Court concludes that both the heavy weight of the evidence and the cumulative effect of the errors committed at trial necessitate that Mr. Thomas's Rule 33 motion be granted.

## I.   <u>Standard of Review</u>

In ruling on a Rule 33 motion, courts have determined that any error sufficient to require a reversal on appeal is an adequate ground for granting a new trial.  FEDERAL PRACTICE AND PROCEDURE at § 589; *see e.g.*, *United States v. Walters*, 89 F. Supp. 2d 1206, 1213 (D. Kan. 2000), *aff'd*, 28 F. App'x 902 (10th Cir. 2001); *but see United States v. Scroggins*, 379 F.3d 233 (5th Cir. 2004) (applying a more discretionary standard), *vacated on other grounds*, 543 U.S. 1112 (2005); *Vicaria*, 12 F.3d at 198–99 (same).  In determining whether errors are sufficient to warrant reversal on appeal, the Court is bound by various rules that typically govern appellate review.  For example, the Court may not order a new trial for "harmless error."  *United States v. Jones*, 818 F.3d 1091, 1101 (10th Cir. 2016) (elaborating the "harmless error" standard); *Valencia*, 600 F.3d at 429–30 (applying the harmless error standard to a motion for a new trial).

---

[4] Mr. Thomas's asserted first and eleventh "grounds" are not proper bases for determining a Rule 33 motion at all, and will not be addressed in this Order.  The Court summarizes the remaining nine grounds as attacks on: (1) the tone and theme of the prosecution's case, (2) the weight of the evidence presented and not presented regarding Mr. Thomas's guilt, (3) defense counsel's failure to object to erroneous argument and erroneously admitted evidence and testimony, and (4) the Court's failure to correct the above errors.  *See* Doc. 222, Mot. for New Trial, at 1–3.

Additionally, multiple errors that may be "harmless" on their own may, under the "cumulative error" doctrine, be considered sufficient to warrant a new trial. *See United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007). In *Barrett*, the Tenth Circuit explained that even if errors are individually harmless, in reviewing errors, a court must "consider whether the defendant's substantial rights were affected by the cumulative effect of the harmless errors." *Id*.

In making a determination under Rule 33, the Court must "balance the alleged errors against the record as a whole and evaluate the fairness of the trial." *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988). As courts within the Tenth Circuit have explained, "the decision whether to grant a motion for new trial is committed to the sound discretion of the trial court." *United States v. Daniels*, 188 F. Supp. 2d 1309, 1311 (D. Kan. 2002); *United States v. Mann*, 982 F. Supp. 2d 1251, 1259 (D.N.M. 2013).

## II.   <u>Weight and Sufficiency of the Evidence</u>

Several of the "grounds" in Mr. Thomas's Rule 33 motion challenge the weight of the evidence supporting his conviction. *See* Doc. 222, Mot. for New Trial, at 1–3. In making a ruling regarding the weight of the evidence, the Supreme Court has acknowledged that trial courts have broad discretion and are free to assess a witness's credibility and make other evidentiary determinations. *Tibbs v. Florida*, 475 U.S. 31, 37–38 & 38 n.12 (1982). The Tenth Circuit has further stated that when "deciding a motion for new trial, the [trial] court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994).[5]

---

[5] Other circuits have characterized a judge ruling on a Rule 33 motion as sitting as the "thirteenth juror." *E.g., United States  v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010).

Under Rule 33, in contrast to Rule 29, the Court need not view all the evidence in the light most favorable to the government, and may instead weigh the evidence in a manner that more accurately describes the proceedings. *Tibbs*, 457 U.S. at 37; *United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) (holding that a court's discretion to grant a new trial based on a Rule 33 motion is broader than when the motion is filed under Rule 29). The distinction between the inferences the Court is required to draw in favor of the prosecution under the different standards is explained by the Supreme Court in *Tibbs v. Florida*. 457 U.S. 31 (1982). There, the Supreme Court explained the difference between rulings based on the weight of the evidence and rulings based on the sufficiency of the evidence, stating:

> a conviction rests upon insufficient evidence when, even after viewing the evidence in the light most favorable to the prosecution, no rational factfinder could have found the defendant guilty beyond a reasonable doubt. A reversal based on the weight of the evidence, on the other hand, draws [the court] into questions of credibility. The "weight of the evidence" refers to a determination by the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.

*Tibbs v. Florida*, 457 U.S. 31, 37–38 (1982) (quotations omitted). Because the Court is allowed under Rule 33 to weigh the evidence accurately and without mandatory inferences in favor of the prosecution, "the trial court has the authority to grant the defense a second opportunity where that court concludes that, despite the abstract sufficiency of the evidence, the conviction is against the weight of the evidence." FEDERAL PRACTICE AND PROCEDURE at § 24.6(d). Appellate courts provide special deference to a trial court's weighing of the evidence under Rule 33. *E.g., United States v. Kellington*, 217 F.3d 1084, 1101 (9th Cir. 2000) ("Indeed, we owe special deference to the district court's evaluation of the testimony at trial . . . in its conclusion that the evidence preponderates sufficiently heavily against the verdict to merit re-trial."); *see*

*United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000) (affording special deference to a trial court weighing evidence under Rule 29).

Here, the heavy weight of the evidence, perhaps better stated as the remarkable absence of evidence, mitigates in favor of granting the Rule 33 motion.  The United States in this case chose to prosecute Mr. Thomas through inference.  The central theme in counsel's closing argument was that Mr. Thomas's flight from Agent Hella was evidence of a "guilty mind" and that Mr. Thomas's failure to offer reasonably exculpatory statements further highlighted his criminality regarding the offense charged.  At an evidentiary hearing almost one year before the trial in this case, the Court warned counsel that "it does not find this [foot chase] remarkable or suspicious[.]"  *See, e.g.*, Doc. 134, Order on Suppression, at 4–5, *reconsidered on other grounds*, Doc. 169.  The Court is not persuaded to change its evaluation of the evidence after being presented with it a second time at trial.

The main piece of evidence offered by the United States that the Court determines could have foreseeably indicated Mr. Thomas's guilt regarding the specific offense charged is Mr. Thomas's purported confession.  As a general matter, confessions that result from police interrogation are best regarded with suspicion given the motivation of the interrogating officer, the relative powerlessness of an arrestee – particularly one not represented by counsel at the time of the interrogation, the recent trauma of the arrest on the arrestee, and a guilty arrestee's obvious motive to lie.  *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997) (elaborating various non-exclusive factors that might undermine the value of confessions resulting from police interrogation), *abrogated on other grounds by Corley v. United States*, 129 S. Ct. 1558 (2009); *see* 10th Cir. Pattern Jury Instruction §§ 1.25–1.26.  As U.C. Irvine criminology Professor

Richard Leo and Berkeley Sociology Professor Richard Olfshe have exhaustively cataloged, the methods used by interrogating officers to obtain confessions, combined with the disproportionate weight those confessions are given by the jury, makes convictions based primarily on confession and uncorroborated by other direct evidence particularly problematic.  Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. Crim. L. & Criminology 429, 429–35 (1998).

Here, Officer Davis stated that Mr. Thomas allegedly "confessed" to Officer Davis during police interrogation that he sometimes received money "off the books" from Mr. Caballero by acting as a lookout and that he believed that Mr. Caballero was a dealer of narcotics, potentially marijuana.  Trial of Roberto Thomas, April 21, 2016, at 2:53–55 pm; 3:16 pm (summarizing the results of the interrogation and mentioning a belief by Mr. Thomas that Mr. Caballero was a marijuana dealer).  Officer Davis appeared eager to assist the prosecution with his testimony and was able to recall on the stand damaging statements by Mr. Thomas that had gone completely unrecorded in the reports of the so-called "confession" during and after the interrogation and which Officer Davis had never mentioned in any of his prior testimony in this case.  *Compare id.* at 2:54–56, 3:11, *with* doc. 125, Tr. of Suppress. Hearing, at 145–65.  Even with the enhanced powers of recollection that Officer Davis displayed at trial, Officer Davis was ultimately unable to state whether Mr. Thomas mentioned any knowledge of the drug transaction for which he was on trial, and the interrogation produced no evidence of knowledge on behalf of Mr. Thomas of any particular drug transaction within the scope of the charged conspiracy.  *See, e.g.,* Trial of Roberto Thomas, April 21, 2016, at 3:13 pm; *cf.* Doc. 201, Superseding Indictment

(alleging a conspiracy to distribute methamphetamine and not marijuana). Given the statements attributed to Mr. Thomas and labeled as a "confession" before the jury appear not to indicate that Mr. Thomas was involved in the crime with which he was charged, the Court is unwilling and unable to infer from Officer Davis's statements that Mr. Thomas in fact "confessed" to Officer Davis.

The Court notes that the interrogation in this case is entitled to less weight than a normal interrogation because it appears that at the time of the interrogation Officer Davis was essentially unfamiliar with the facts of the case and made no memorialization of the interrogation until several days after the interrogation occurred – at which point the record of the interrogation was revised by someone familiar with the case but not present at the interrogation. Trial of Roberto Thomas, April 21, 2016, at 2:55–56. At trial, Officer Davis said that before the interrogation he did not know why Mr. Thomas was arrested but that he "knew it was drug related" and that he "just conducted the interview." Trial of Roberto Thomas, April 21, 2016, at 2:55. As Stanford University Professor Jennifer Eberhardt and her colleagues have identified, priming police officers with crime-related stimuli causes them to erroneously associate individuals with criminality and causes errors in perceptual memory. Jennifer L. Eberhardt *et al.*, *Seeing Black: Race, Crime, and Visual Processing*, 87 J. PERSONALITY & SOC. PSYCHOL. 876, 885–88 (2004) (reporting the results of a "crime-prime" on police misidentification). Although not detailed by Dr. Eberhardt, it is likely that these errors are compounded when police officers are relatively unfamiliar with the individual in question, and contemporary scientists have exhaustively detailed how these errors in perceptual memory would cause witnesses to inject associative biases into their recollection. *See, e.g.*, DANIEL KAHNEMAN, THINKING, FAST AND SLOW 216

(2011) (explaining that people remember facts that confirm their biases and disregard facts that contradict them); ALBERT BANDURA, SOCIAL FOUNDATIONS OF THOUGHT AND ACTION 223 (1986) (same). These failures of memory would undoubtedly influence a witness's testimony in favor of their biases. PHILIP G. ZIMBARDO & MICHAEL R. LEIPPE, THE PSYCHOLOGY OF ATTITUDE CHANGE AND SOCIAL INFLUENCE 162–63 (1991) ("But despite all good intentions to 'let the facts speak for themselves,' biases based on our existing attitudes can sneak into our perception and interpretation of the 'facts.' What we notice in a message, how we interpret ambiguous message information, and which beliefs and knowledge are conjured from memory during the cognitive response process are all affected in subtle ways by one's existing point of view.").

As previously stated, Officer Davis appeared eager to assist the prosecution's case and in at least one instance suddenly remembered on the stand incriminating testimony by Mr. Thomas that was not documented in the original memorialization of the interrogation on in Officer Davis's previous testimony before this Court. In particular, Officer Davis was able to recall on the stand that Mr. Thomas admitted that Mr. Caballero placed a brown paper bag (which was later found to contain methamphetamine) into Mr. Thomas's control moments before the arrest. This is the only evidence the prosecution ever presented that Mr. Thomas "possessed" the substance at issue in this case. However, this critical statement was never documented in the police report made of Mr. Thomas's interrogation and Officer Davis had never mentioned this statement in any of his prior testimony in this case. *Compare id.* at 2:54–56, 3:11 (Officer Davis remembering these facts and being cross-examined on them), *with* doc. 125, Tr. of Suppress. Hearing, at 145–65 (omitting these facts). Consequently, this Court is further inclined to

discount the value of an alleged confession by Mr. Thomas that went unmemorialized for several days (or years) and was subsequently revised.

As a result of the above factual findings, the Court concludes that the heavy weight of the evidence at trial favored acquittal rather than conviction.

Regarding the conspiracy charges, the Court is aware that the prosecution possessed evidence of Mr. Thomas's innocence that was not presented by either party at trial, particularly at least one statement of which the Court is aware whereby Mr. Thomas's alleged co-conspirator stated under oath that Mr. Thomas was not involved in the alleged conspiracy. The fact that the prosecution was aware of this statement no doubt influenced its decision not to call Mr. Thomas's alleged co-conspirators[6] and ultimately compelled the prosecution to dismiss this count of the indictment.

Regarding the possession charge, the United States' only piece of direct evidence presented is Mr. Thomas's alleged confession that he had previously assisted Mr. Caballero "off the books" to sell marijuana. This "confession" does not prove that Mr. Thomas was involved in the large-scale possession and distribution methamphetamine that was the target of the DEA investigation in this case.

Overall, the Court remains concerned that the United States chose to proceed to trial on a conspiracy charge yet presented no direct evidence linking Mr. Thomas to that conspiracy and possessed evidence that Mr. Thomas was not involved in the conspiracy. The Court is further concerned that the United States proceeded to trial on a possession charge for which it could present essentially no direct evidence. Instead, contrary to the United States' pre-trial

---

[6] These alleged co-conspirators had standard plea deals that obligated them to cooperate with the United States prosecution of Mr. Thomas. *See, e.g.*, Doc. 103, J.C. Plea Agreement; Doc. 112, C.T. Plea Agreement; Doc. 147, J.A. Plea Agreement.

representations to this Court, the government chose to focus its evidentiary presentation on the flight of Mr. Thomas from Agent Hella and Mr. Thomas's subsequent arrest.

In *United States v. Robertson*, a case much stronger than the one presented by the United States here, the Fifth Circuit rejected the government's challenge to a trial court's ruling granting a new trial when the government provided primarily circumstantial evidence linking a defendant to a particular drug transaction.  110 F.3d 1113 (5th Cir. 1997).  In *Robertson*, the Fifth Circuit held that the district court did not abuse its discretion in granting new trial on drug charges where the only evidence of the defendant's involvement in a drug transaction was: (1) his presence at a restaurant table with participants in the conspiracy; (2) the fact that his name was mentioned on surveillance tapes in conspicuous manner that were obtained during an investigation into the conspiracy; (3) that he was observed with participants in the conspiracy engaging in counter-surveillance activities; and (4) that when he was detained and told of the participants' arrest he showed signs of nervousness.  *Robertson*, 110 F.3d at 1115–20.  The trial court in Robertson summarized its evidentiary findings by stating that the government relied on essentially three pieces of circumstantial evidence in its case: (1) the defendant appeared at numerous locations with the co-conspirators; (2) the co-conspirators were using the defendant's vehicle to get to those various locations; and (3) the defendant acted at the time of his arrest in a manner that indicated guilt. *Robertson*, 110 F.3d at 1118 n.10.

The Fifth Circuit summarized its ruling rejecting the government's appeal as follows:

A close review of the transcript shows that the district court did not view the evidence in the light most favorable to the verdict. We are convinced that the court weighed the evidence and assessed the credibility of the witnesses in reaching its conclusion that the jury verdict was contrary to the weight of the evidence. The court simply considered Robertson's guilty verdict in light of all of the evidence adduced at trial and concluded that the government did not satisfy the standard of proof beyond a reasonable doubt. Thus, after carefully reviewing

25

the record, we are convinced that the district court did what it said it would do --
rule on a motion for new trial.

*Robertson*, 110 F.3d at 1117–18.  The Court reaches the same conclusion here.  Because the evidence presented at trial heavily indicated that the government failed to carry its burden of proof beyond a reasonable doubt, the Court rules that Mr. Thomas's Rule 33 motion is GRANTED.

### III.    Trial Error

In addition to moving under Rule 33 based on the weight of the evidence presented, Mr. Thomas has also moved for a new trial based on various trial errors, including error by the prosecution, errors by the defense, and errors by the Court.  *See* Doc. 222, Mot. for New Trial, at 1–3.

### a.  Prosecutorial Errors[7]

In assessing prosecutorial conduct, the United States Supreme Court explains that counsel for the United States, because of their role as a public officer and civil servant, must be held to the highest of professional standards.

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

---

[7] The Court notes at the outset of this analysis that Santa Fe has only a small legal community and that it has had a long and productive relationship with the counsel for the United States in this matter spanning many years.   The Court has generally known counsel to act with competence and integrity, and looks forward to many more years of counsel representing the United States before the Court.

*Berger v. United States,* 295 U.S. 78, 88 (1935); *United States v. Gabaldon,* 91 F.3d 91, 94–95 (10th Cir. 1996) (quoting same).   The Tenth Circuit has reprimanded prosecutors for a "willingness to unnecessarily push the envelope" of what is permissible at trial.   *United States v. Broomfield*, 201 F.3d 1270, 1276 (10th Cir. 2000).   Courts have held that prosecutorial errors warrant a new trial under Rule 33 where the prosecutor's conduct "prejudicially affected the substantial rights of the defendant."   *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004).

The decision whether to grant a defendant's motion for new trial based on prosecutorial error is committed to the discretion of the district court.   *See United States v. Gordon,* 173 F.3d 761, 769 (10th Cir.1999) (*citing Gabaldon,* 91 F.3d at 94).   Courts "engage in a two-step process in reviewing claims of prosecutorial misconduct.   First, we determine if the conduct was improper.   Second, we determine if any improper conduct warrants [a new trial]." *Gordon*, 173 F.3d at 769; *United States v. Taylor*, 514 F.3d 1092, 1104 (10th Cir. 2008).   Factors to be considered in determining whether a new trial is warranted include: "(1) the magnitude of the prejudicial effect [of the errors]; (2) the efficacy of any cautionary instructions; and (3) the strength of the evidence of defendant's guilt."   *Wall*, 389 F.3d at 474.   In determining whether the errors affected the outcome of a trial, courts consider "the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole." *United States v. Lonedog*, 929 F.2d 568, 572 (10th Cir. 1991) (quoting *United States v. Martinez–Nava,* 838 F.2d 411, 416 (10th Cir.1988)).   Granting a new trial is necessary if the improper conduct influenced the verdict. *United States v. Alexander,* 849 F.2d 1293, 1296 (10th Cir.1988). Examples of prosecutorial errors sufficient to warrant a new trial under Rule 33 include instances where a prosecutor makes an assertion to the jury of a fact unless there is evidence of that fact,

misstates the law in closing argument, or draws attention to the defendant's decision to remain silent. FEDERAL PRACTICE AND PROCEDURE at § 588. However, even egregious errors by a prosecutor will not support a ruling in favor of a new trial if the prosecutor's remarks were not prejudicial or if, in the light of all the evidence, they can be regarded as harmless error. *See Lonedog*, 929 F.2d 568.

i.      *Arguments Drawn from Erroneously Presented Evidence*

Here, Mr. Thomas asserts that the United States has made a series of improper arguments throughout the trial that impermissibly prejudiced the jury in favor of the government. Doc. 222, Mot. for New Trial, at 1–3.

At the outset, the Court notes that not all misstatements by the prosecution provide a basis for granting a Rule 33 motion. For example, in *U.S. v. Carleo*, the Tenth Circuit held that the unsanctioned remarks from the prosecution framed in the first-person singular were best characterized as a "mannerism" regarding what transpired in the courtroom and should not be construed in a manner that constituted prosecutorial error. 576 F.2d 846, 851–52 & 851 n.1 (10th Cir. 1978). As a result, the trial court did not abuse its discretion in denying a Rule 33 motion. *Id.* at 852. Similarly, in *Devine v. United States*, the Tenth Circuit held that off-the-cuff remarks belittling the arguments of the opposing counsel were deplorable and beyond the scope of legitimate argument, but not sufficient to reverse a district court's determination that the remarks did not constitute prosecutorial error despite the heightened ethical burdens placed on a public prosecutor. 403 F.2d 93, 96 (10th Cir. 1968); *see also United States v. Brewer*, 630 F.2d 795, 803 (10th Cir. 1980) (allowing a prosecutor latitude in characterizing the defendant's arguments); *United States v. Gilbert*, 447 F.2d 883 (10th Cir. 1971) (affirming a judgment

allowing the prosecution special latitude in presenting arguments that go beyond the evidence presented at trial).

However, in instances of prosecutorial conduct substantially similar to the present case, the Tenth Circuit has reversed district court judges for failing to grant motions for post-trial relief. For example, in *United States v. Novak*, the Tenth Circuit held that when a prosecutor relied on hearsay testimony from a confidential informant and sought an inference by the jury that the defendant was a distributor of cocaine based on inadequate evidence, it was an abuse of discretion for a court not to order a mistrial. *United States v. Novak*, 918 F.2d 107, 108–11 (10th Cir. 1990). In *Novak*, the Tenth Circuit held that a prosecutor wrongly introduced hearsay testimony that assertedly "established the basis for the D.E.A.'s investigation [into a drug conspiracy, but actually] . . . far exceeded the government's asserted purpose . . . [and] cannot be equated with 'routine testimony' used by police officers to establish why they commenced an investigation." *Id.* at 109. Moreover, the government presented improper circumstantial evidence of the defendant's guilt and was clearly aware of the problems with that evidence because of pretrial representations the government had made to counsel and the court. *Id.* at 110 ("The government's stipulation . . . had been given pretrial consideration."). The Tenth Circuit held that the errors committed by the prosecution in *Novak* were particularly problematic because it helped the government obtain a conviction based on otherwise circumstantial evidence:

> No direct evidence . . . was introduced implicating Novak directly or indirectly in a distribution scheme or of any isolated incidents. Instead, the government's case was built solely on inferences drawn from weapons and scales found in Novak's house, the positioning of Novak's furniture, and the quantity of cocaine found in Novak's kitchen.

29

*Id.* at 111.  As the Tenth Circuit ultimately held, because of the improperly presented evidence and "in light of the completely circumstantial nature of the government's case," the government's contention that the evidence proved beyond a reasonable doubt that the defendant possessed cocaine with the intent to distribute it was "simply untenable."  *Id.* at 111.

The case at bar proceeded much the way *Novak* did.  The Court spent considerable time before trial reviewing the evidence the parties intended to present, including their arguments in their motions in limine.  The Court issued orders in limine and held a special status conference to discuss evidentiary issues, including the lack of admissible evidence to support the conspiracy charge in this case.  Doc. 206, Clerk's Minutes re Status Conference; Doc. 207, Order Re Hearsay; Doc. 208, Order Re Speculation.  The Court was particularly concerned by the apparently circumstantial nature of the government's case and the government's decision not to present testimony, including testimony from a confidential informant, which would link Mr. Thomas to Mr. Amaya's drug distribution network or a particular drug transaction.  *See* Doc. 206, Clerk's Minutes re Status Conference.  The Court specifically declined to review particular evidentiary matters before trial based on representations by the United States that it would not get into them.  Doc. 207, Order Re Hearsay; Doc. 208, Order Re Speculation, at 1–2 (declining to rule on the issue based on representations that the government would not attempt to argue that "'people typically don't flee' after vehicle accidents.").  At trial, the United States elicited considerable hearsay testimony regarding the larger drug conspiracy and the particular transaction with which Mr. Thomas was allegedly tangentially involved.  Doc. 223, Partial Transcript of Proceedings, at 1–37.  The United States then proceeded to focus their case on Mr. Thomas's flight from Agent Hella.  Doc. 221, Transcript of Proceedings, at 3–4, 7, 14–16.

Based on the pretrial representations made by the United States, the Court and defense counsel were led to believe that this would not be a part of the government's case. The Court had further informed the United States that "it does not find [Mr. Thomas's flight] remarkable or suspicious," despite it being the apparent centerpiece of the prosecution's case. Doc. 207, Order Re Hearsay, at 1–7; Doc. 208, Order Re Speculation, at 1–2; Doc. 134, Order on Suppression, at 3–5, *reconsidered on other grounds*, Doc. 169.[8]

With many of the above violations, the Court had specifically declined to address the objections in limine made by Mr. Thomas based on the United States' representations that it would not get into the matters that, in fact, formed the backbone of the United States' case. Doc. 207, Order Re Hearsay, at 1–2; Doc. 208, Order Re Speculation, at 1–2. Furthermore, the Court provided specifically that if the United States were to attempt to get into such matters, "it must first seek permission from the Court to do so." *Id.* No such permission was ever sought from the Court.

---

[8] The United States may have thought, too cleverly, that it could evade the Court's judgment by merely representing that it would not present any "testimony" on this matter and then proceed, without appropriate evidentiary foundation, to argue it to the hilt in closing. *See* Doc.193, Opp. to MIL Re Speculation, at 4–5 ("the United States will not elicit this <u>testimony</u> in its direct examination of any of its witnesses.") (emphasis added); Doc. 221, Transcript of Proceedings, at 10–14 (the United States highlighting for the jury the Court's instruction on circumstantial evidence and the language in the Court's reasonable doubt instruction about common sense interpretation of the evidence). This is, of course, wrong, since any arguments not based on evidence are nonetheless improper, and a prosecutor cannot save such improper argument merely by referring to a jury instruction on common sense inference. As the D.C. Circuit has powerfully stated:

> In summarizing evidence supporting conviction, a prosecutor may not take artistic license with the trial evidence, construct a more dramatic version of the events, provide conjecture about a victim's state of mind, and then defend against a prosecutorial misconduct claim by maintaining the statements are "fact—based." Sensationalization, loosely drawn from facts presented during the trial, is still a statement of fact to the jury not supported by proper evidence introduced during trial, clearly designed to inflame the passions or prejudices of the jury.

*United States v. Moore*, 651 F.3d 30, 53 (D.C. Cir. 2011) (citations and quotes omitted), *aff'd in part sub nom. Smith v. United States*, 133 S. Ct. 714 (2013). Any such interpretation would be a clear violation of the rules of evidence. This is doubly true given that the Court specifically instructed the United States to first approach the Bench before attempting to get into the matter. Doc. 208, Order Re Speculation, at 1–2. Here, no approach was ever made, thus the argument violated not only the rules of evidence, but also a previous Court Order.

As the Tenth Circuit held in *Novak*, when the United States presents evidence in conflict with pre-trial representations and with known hearsay problems and then proceeds to try a case relying heavily on circumstantial evidence, denying a motion for post-trial relief constitutes reversible error.  *Novak*, 918 F.2d 107, 111 (10th Cir. 1990); *see also United States v. Walters*, 28 F. App'x 902, 908–10 (10th Cir. 2001) (failing to abide by a court's order in limine and improperly eliciting witness testimony may form the basis for granting a motion for a new trial).[9]

The Tenth Circuit also found reversible error warranting a retrial in another similar case involving the alleged sale of narcotics.  *United States v. Rios*, 611 F.2d 1335 (10th Cir. 1979).  In *United States v. Rios*, the Tenth Circuit noted that the trial court inexplicably allowed substantial hearsay testimony without a satisfactory limiting instruction.  *Id.* at 1340–41.  The Tenth Circuit further found that it was prejudicial error to allow a prosecutor, in closing argument, to rely heavily on inferences that were not substantiated through direct evidence.  *Id.* at 1342–43.  The Tenth Circuit ultimately ruled that these errors, when considered together, warranted a retrial. *Rios*, 611 F.2d at 1341.

Similarly, in *United States v. Cass*, the Tenth Circuit strongly rebuked the United States for relying extensively on hearsay testimony to prove its case in chief relying on the "background investigation" exception used by the United States here.  127 F.3d 1218, 1222–25 (10th Cir. 1997).  In contrast to *Rios*, Tenth Circuit held in *Cass* that the improper solicitation of hearsay evidence by the United States was not "plain error," but only because "[e]ven without

---

[9] While the Tenth Circuit ultimately ruled in *Walters* that failure to grant a motion for a new trial was not an abuse of discretion, the court took care to note that the testimony that violated the court's order in limine was not directly solicited by the prosecution.  28 F. App'x at 908; *see U.S. v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999) (finding no prosecutorial misconduct when a prosecutor's witness improperly testified in an unsolicited manner). As the Court admonished counsel after the first day of trial, some of the government's testimony was in fact improperly solicited by the United States in violation of the Court's order.  Doc. 223, Partial Transcript of Proceedings, at 14.

the hearsay testimony the government put on a very strong case." *Cass*, 127 F.3d at 1225 (10th Cir. 1997).  As explained in the preceding Section, the United States' case against Mr. Thomas was exceptionally weak.

Based on the cumulative effect of the above mentioned errors, as well as the errors further described below, Mr. Thomas's motion for a new trial is GRANTED.  Because the Court's ruling is based on the cumulative effect of all of these errors, the Court need not make a ruling about whether any particular error in this case rises to the level of "prosecutorial misconduct" and specifically abstains from doing so at this time.

       *ii.*      *Inferences of Guilt Drawn from Mr. Thomas's Silence*

According to Mr. Thomas, the most problematic of the alleged errors by the prosecution are the statements made by the prosecution in its closing argument regarding Mr. Thomas's failure to offer exculpatory testimony.  *See* Doc. 222, Mot. for New Trial at 3 ¶ 9, 4–8; *see generally* Doc. 224, Opp. to Mot. for New Trial.  Indeed, statements made by the prosecution in its closing argument may be the basis for a motion for a new trial.  *Walters*, 28 F. App'x at 908–10.  The Tenth Circuit has held that statements by the prosecution implicating a defendant's right to remain silent by highlighting the defendant's failure to make exculpatory statements at the time of arrest is an error "so plain, fundamental and serious" that it may require the reversal of conviction "although timely objection was not made thereto in the trial court."  *United States v. Nolan*, 416 F.2d 588 (10th Cir. 1969).[10]

---

[10] There are some exceptions to this rule.  For example, in *United States v. Whitman*, the Tenth Circuit held that brief or passing references to a defendant's failure to testify, while erroneous, do not rise to the level of prosecutorial misconduct sufficient to grant a motion for a new trial.  665 F.2d 313 (10th Cir. 1981).  The Tenth Circuit has also found that, in cases where there is "overwhelming" evidence of a defendant's guilt, improperly commenting on a defendant's right to remain silent does not constitute prosecutorial misconduct sufficient to warrant a new trial. *Pickens v. Gibson*, 206 F.3d 988, 999 (10th Cir. 2000).

The United States contends that while as a general rule an inference of guilt may not be drawn from a defendant's post-arrest silence, that rule only applies as long as a defendant has been *Mirandized*.  Doc. 224, Opp. to Mot. for New Trial, at 5–6.  The United States relies on the following cases from the Fifth, Eighth, and Eleventh Circuit for this proposition: *United States v. Osuna-Zepeda*, 416 F.3d 838, 844 (8th Cir. 2005) and *United States v. Frazier*, 408, F.3d 1102 (2005), which the United States asserts stand for the proposition that there can be no prosecutorial error when referring to pre-*Miranda* silence when "there was no governmental action . . .  inducing his silence"; and *United States v. O'Keefe*, 461 F.3d 1338, 1347 (11th Cir. 2006) and *United States v. Salinas*, 480 F.3d 750, 757 (5th Cir. 2007), which the United States asserts stands for the proposition that no violation of the Fifth Amendment can occur until after an arrestee has been *Mirandized*.  Doc. 224, Opp. to Mot. for New Trial, at 5–6.   Mr. Thomas argues that the United States misinterprets the law in this area and that: "Contrary to the United States' argument, *Jenkins v. Anderson*, 447 U.S. 231 (1980) did not decide that post-arrest, pre-*Miranda* silence was proper for use to impeach a non-testifying defendant."  Doc. 226, Reply ISO Mot. for New Trial, at 4–5 (citing *Carter v. Ward*, 347, F.3d 860, 863–64 (10th Cir. 2003)). Mr. Thomas further argues that the majority of the circuit courts to address the issue have ruled against the use of post-arrest, pre-*Miranda* silence as indication of a defendant's guilt.  Doc. 226, Reply ISO Mot. for New Trial, at 4–5 (citing *United States v. Velarde-Gomez*, 269 F.3d 1023, 1028–30 (9th Cir. 2001) (en banc); *United States v. Moore*, 104 F.3d 377, 384–90 (D.C. Cir. 1997); *United States v. Hernandez*, 948 F.2d 316 (7th Cir. 1991); *United States v. Salinas*, 480 F.3d 750 (5th Cir. 2007); *Combs v. Coyle*, 205 F. 3d 269 (6th Cir. 2000); and *Coppola v. Powell*, 878 F.2d 1562 (1st Cir. 1989)).

Mr. Thomas is right that this is a question of law that has not been decided by the Supreme Court – although it was recently raised before the Court in *Salinas v. Texas*, 133 S. Ct. 2174 (2013). The general rule in the *Miranda* context is that, when faced with government coercion, a criminal defendant need not invoke the protections of the Fifth Amendment in order to benefit from the Fifth Amendment's protection. *Miranda v. Arizona*, 384 U.S. 436, 468 n.37 (1966) ("In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."). In *Salinas*, the Supreme Court considered, but was ultimately unable to decide, whether this general rule applied to a criminal defendant's post-arrest, pre-*Miranda* silence. Instead, the Justices split 3-2-4 and affirmed the Texas state court without a majority ruling on any controlling principle of law. *See generally Salinas v. Texas*, 133 S.Ct. 2174 (2013); LaFave, Israel, King & Kerr, Criminal Procedure § 9.6(a) (4th ed. 2015) (addressing various unresolved issues raised by the *Salinas* opinion). Justice Alito, writing for Chief Justice Roberts, Justice Kennedy, and himself, reasoned that because Mr. Salinas had voluntarily followed the police to the police station, submitted to a police interview, and answered the vast majority of the interviewing officer's questions, "[t]hat place[d] petitioner's situation outside the scope of *Miranda*[.]" *Salinas*, 113 S.Ct. at 2180 (plurality opinion). At the point that Mr. Salinas decided to remain silent, no arrest had occurred and Mr. Salinas "was free to leave at any time during the interview." *Id.* (citation omitted). Because Mr. Salinas was not in police custody, had voluntarily agreed to an interview, had already answered the vast majority of the police's questions, and continued to answer the police's questions after remaining silent in

response to one question, Justice Alito concluded that the Fifth Amendment did not apply in Mr. Salinas's case. *Id.*

In contrast to the three-Justice plurality opinion authored by Justice Alito, Justice Thomas, writing on behalf of himself and Justice Scalia, preferred to affirm the decision of the Texas state court because, according to the two-Justice concurring opinion, there is no Fifth Amendment rule that "prohibits a prosecutor or a judge from commenting on a defendant's failure to testify." *Id.* at 2184 (Thomas, J., concurring). In further contrast, Justice Breyer, writing on behalf of Justices Sotomayor, Ginsburg, Kagan, and himself, preferred to reverse the Texas state court because as a general matter the Fifth Amendment "prohibits the prosecution from commenting on the [defendant's] silence in response to police questioning." *Id.* at 2185 (Breyer, J., dissenting). According to the four-Justice dissenting opinion, Mr. Salinas's Fifth Amendment rights were implicated by the police questioning because Mr. Salinas would have been "inherent[ly] penalize[ed] simply by answering." *Id.* at 2189.

In this case, the reasoning in *Salinas* the Court finds most persuasive is the plurality opinion of Justice Alito: when an individual who is not in police custody voluntarily speaks at length to the police but then refuses to answer a specific question regarding her guilt, this may in limited circumstances support an inference of her guilt by the jury. *See Salinas*, 113 S.Ct. at 2180 (plurality opinion). However, these circumstances are not present in this case. Mr. Thomas was forcibly detained by the police after being rammed by an unmarked police vehicle and then chased by undercover officers wielding automatic weapons. Therefore, unlike *Salinas*, it is clear that Mr. Thomas "was [not] free to leave at any time" and that any interrogation coercively implicated Mr. Thomas's Fifth Amendment rights. *See id.* Ultimately, because the

Supreme Court failed to reach a majority opinion in the *Salinas* case and because the current Supreme Court would more likely than not reach a ruling different from that articulated by Justice Alito,[11] the Court in this case is hesitant to rely on Justice Alito's reasoning.  Given that the Tenth Circuit has not ruled on the issue, the Court finds the longstanding course charted by the Second Circuit to be the most prudent: "The Second Circuit has assumed, without deciding, that [the] use of a defendant's pre-*Miranda* silence is impermissible."  *United States v. Caro*, 637 F.2d 869, 876 (2d Cir. 1981).

Although the Court chooses not to rule on the issue here, the Court notes that, were the Tenth Circuit to require the Court to address the issue on remand, the Court would find the prosecution's arguments in this case impermissible because the prosecution's arguments were highly prejudicial and the Court simply does not believe that such silence is very probative.  As prominent conservative legal scholar Orin Kerr has explained, "it is relatively easy for the government to claim that a suspect's reaction to an incriminating question suggests guilt – and very hard for a defendant to challenge that characterization," and that "it seems unlikely that a person questioned by a police officer outside of custody is going to formally assert his Fifth Amendment right" because people generally "don't think in terms of legal formalities."  Orin

---

[11] The Supreme Court is likely to rule that the Fifth Amendment of the Constitution requires the application of the three-part test articulated by Justice Breyer's dissent:

> Much depends on the circumstances of the particular case, the most important circumstances being: (1) whether one can fairly infer that the individual being questioned is invoking the Amendment's protection; (2) if that is unclear, whether it is particularly important for the questioner to know whether the individual is doing so; and (3) even if it is, whether, in any event, there is a good reason for excusing the individual from referring to the Fifth Amendment, such as inherent penalization simply by answering.

*Salinas*, 133 S. Ct. at 2189 (2013) (Breyer, J., dissenting).  As stated earlier, this three-part test received support from a greater number of Justices than either Justice Alito's test or Justice Thomas's test.  *See generally* LAFAVE, ISRAEL, KING & KERR, CRIMINAL PROCEDURE § 9.6(a) (4th ed. 2015) (noting that the Supreme Court split 3-2-4 on the issue).

Kerr, *Do You Have a Right to Remain Silent? Thoughts on the "Sleeper" Criminal Procedure Case of the Term*, Salina v. Texas, THE VOLOKH CONSPIRACY, (June 17, 2013), http://www.volokh.com/2013/06/17/do-you-have-a-right-to-remain-silent-thoughts-on-the-sleeper-criminal-procedure-case-of-the-term-salinas-v-texas/ (last visited July 13, 2016). As a general matter, Justice Rehnquist clarified in the case *Dickerson v. United States* that *Miranda* is based on a prophylactic principle embodied in the Constitution that requires an arresting officer to explain to a suspect the suspect's rights under the Fifth Amendment before beginning any interrogation. 530 U.S. 428, 438–41 (2000). The reason why the *Miranda* rule is "prophylactic" is because it is incredibly unlikely that an indigent criminal defendant will affirmatively assert her right to remain silent unless the government informs the indigent defendant of the existence, scope, and consequence of that right. The protection of indigent defendants in exactly this manner is the entire reason for the *Miranda* warning requirement. As the Supreme Court explained in *Miranda*: "In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). In light of the clear purpose of *Miranda* and the unreasonableness of the assertion that Mr. Thomas could have invoked his Fifth Amendment rights *sua sponte* and without counsel, the Court sees no reason to adopt the legal fiction that the government requests. There is simply no logical basis to conclude that the indigent and then-unrepresented Mr. Thomas should have affirmatively invoked his *Miranda* rights <u>before</u> they were read to him.

Even without issuing a ruling on this basis, there is ample evidence of courtroom error based on Mr. Thomas's other asserted grounds for a new trial.  *See* Doc. 222, Mot. for New Trial, at 1–3.  In particular, this Court has already ruled that the weight of the evidence heavily favored acquittal in this case and that the United States improperly solicited testimony in violation of its orders in limine and pursued arguments that the Court specifically declined to rule on based on representations by the United States.  Because there are sufficient grounds to otherwise grant Mr. Thomas's motion for a new trial, this Court abstains from determining whether the United States' reliance on Mr. Thomas's post-arrest, pre-*Miranda* silence in its closing arguments constituted prosecutorial misconduct.

### b.  Defense Misconduct

Mr. Thomas has raised trial errors by his own defense counsel as the ninth ground for his Rule 33 motion.  Doc. 222, Mot. for New Trial, at 3 ¶ 9.  In particular, Mr. Thomas mentions that defense counsel failed to offer timely objections to impermissible evidence and argument at trial.  *See id.* ("Defense counsel did not object.").   Improper conduct by defense counsel, including failures to properly advocate on behalf of a client, may provide grounds for a Rule 33 motion.  FEDERAL PRACTICE AND PROCEDURE at § 588.  After the first day of trial, the Court admonished defense counsel for failing to raise timely objections to violations of the Court's rulings.  Doc. 223, Partial Transcript of Proceedings, at 28.  Defense counsel took responsibility for those failures, stating that he "had a very difficult drive home last night [because of his failures on the first day of trial]").  Doc. 223, Partial Transcript of Proceedings, at 28.  Despite the unusual presentation of evidence in this case, defense counsel continued to offer essentially no objections to the questions from the prosecution, statements by the prosecution's witnesses, or

improper argument by the United States.  Furthermore, defense counsel offered no objection to the statements the prosecution made in closing argument or in rebuttal.  *See generally* Doc. 221, Transcript of Proceedings.  The Court is particularly troubled by the fact that Defense counsel did nothing to bring Officer Davis's vague and inconsistent version of Mr. Thomas's alleged confession to the Court's attention and that this "confession" was not the subject of a motion in limine before trial.

These errors, taken alone, may not be sufficient to grant a Rule 33 motion or even a claim of ineffective assistance of counsel.  However, the cumulative effect of these errors, combined with the errors described above and below, further compels the Court's conclusion that a new trial is warranted.

### c.  Admission of Hearsay Evidence and Other Evidence

The unlawful admission of evidence, particularly the admission of evidence that results in a serious miscarriage of justice or an erroneous verdict by the jury, may form the basis for granting a new trial.  *Bell*, 584 F.3d at 486.  For example, the Tenth Circuit has held that racially charged remarks from a witness in a narcotics case, combined with a failure to strike the testimony, can constitute grounds for granting a new trial.  *Torres v. United States*, 333 F.2d 99 (10th Cir. 1964).  While a Rule 33 motion may be denied when a court acts swiftly to cure the prejudice caused by unlawful evidence, *Lopez*, 576 F.2d 840 (denying motion for a new trial when the trial court quickly sustained an objection and instructed the jury to disregard the testimony), the fact that a trial court issued a limiting instruction regarding unlawfully admitted evidence does not preclude a trial court from granting a Rule 33 motion on the basis of that evidence.  *United States v. Colombo*, 909 F.2d 711 (2d Cir. 1990).  This is particularly true when

the evidence creates so strong an impression that it is impossible for the jury to disregard.  *Lopez*, 576 F.2d 840.

    *i.  Hearsay Testimony*

   As described above, a substantial quantity of impermissible hearsay testimony was presented to the jury at trial.  Defense counsel did not object to the vast majority of the erroneously admitted testimony.  *See* Doc. 222, Mot. for New Trial, at 3.  As a result, the Court had difficulty curing the resulting prejudice in the mind of the jury and was generally hindered in its ability to instruct the jury to disregard improper evidence and arguments.  As a result of the Court's frustration regarding a particular subset of this evidence, the Court informed counsel that it would hold an emergency hearing on the matter before the second day of trial, and, at the urging of the United States, issued a limiting instruction regarding the evidence.  Doc. 223, Partial Transcript of Proceedings, at 1–37.  The limiting instruction stated:

> As I have instructed you, certain things are not evidence and must not be considered by you in determining what the facts of this case are.  During the trial, the government's witnesses testified about a potential drug transaction between Jesus Amaya and another unidentified individual whom they described as a "courier" and whom according to the testimony they were hoping to spot on Pajarito Road.  This testimony is not evidence and you may not consider it for any purpose at all, including whether the Defendant had knowledge of drugs in the El Caballero.

Doc. 216, Jury Instructions, at 7.  Defense counsel objected to this instruction and instead moved for a mistrial.  Doc. 223, Partial Transcript of Proceedings, at 29.  The Court believes that issuing that limiting instruction, rather than granting a mistrial, was reversible error.  *See Lopez*, 576 F.2d 840; *Novak*, 918 F.2d at 108–11 (reversing a district court on a series of similar evidentiary issues).

The Court is further concerned that the actual text of the limiting instruction misled the jury and created a false impression of Mr. Thomas's guilt.  In particular, the text of the limiting instruction mentions "another unidentified individual whom [witnesses for the United States] described as a 'courier' and whom according to the testimony [D.E.A. Agents investigating Jesus Amaya] were hoping to spot on Pajarito Road."  Doc. 216, Jury Instructions, at 7.  While this instruction was intended to explain to the jury that the government had presented no direct evidence that Mr. Thomas was aware that a drug transaction was taking place, the Court fears that it had the opposite effect.  Upon re-reading the instruction, it appears to insinuate that Mr. Thomas was the "unidentified courier" for Mr. Amaya even though the evidence the government possessed (which was not presented at trial) actually indicated that Mr. Caballero, and not Mr. Thomas, was Mr. Amaya's courier.  In short, the limiting instruction appears to have outlined an additional, completely factually unsubstantiated means for the jury to infer Mr. Thomas's guilt.  The Court believes that this is a reversible error.  *Mann*, 982 F. Supp. 2d at 1258–59 (submission of an erroneous jury instruction is plain error).

Finally, even if the instruction was not misleading, it would not have been adequate to cure the prejudice caused by the erroneously elicited testimony because the limiting instruction was issued over one day after the testimony was elicited from the government's witnesses and did not cover all of the improper testimony identified by the Court.  The problems with the scope and timing of the instruction further compound the errors in the Court's attempted remedy.  *See Lopez*, 576 F.2d 840 (a court must act swiftly to cure the prejudice from wrongfully elicited testimony).

42

### ii.  Other Prejudicial Testimony

As trial proceeded, further unduly prejudicial and unlawful testimony was elicited.  In particular, the extensive testimony regarding the athletic accomplishments of Agent Hella at the University of New Mexico was irrelevant and created bias in the mind of the jury.  Agent Hella himself appeared to become embarrassed on the stand as he was asked to brag about himself.  Trial of Roberto Thomas, April 21, 2016, at 3:10 pm.  Furthermore, although the Court welcomed the Jury to talk with *counsel* after the trial to discuss how counsel could improve their performance, immediately after the Court dismissed the jury and entered recess, Chambers witnessed several jurors directly approach the United States' witnesses to excitedly discuss Agent Hella's background and role in the arrest, including the firearms possessed by Agent Hella.  As this Court has noted for more than a year, it does not find Agent Hella's role particularly probative of the elements of the offense to which Mr. Thomas was convicted.

The Court is convinced that the cumulative effect of all of the errors described in Sections III of this opinion significantly prejudiced the jury and constituted a miscarriage of justice.  The Court further believes that many of these errors would individually give an appellate court cause to reverse the judgment in this case on appeal.  Although the Court issued a limiting instruction to address one of these errors, the Court recognizes that this limiting instruction was insufficient and misleading, and could have caused the jury to convict Mr. Thomas on a theory for which there is no factual basis.  For the foregoing reasons, Mr. Thomas's motion for a new trial is GRANTED.

### IV.    **Timeliness**

Mr. Thomas asserts in his Reply in Support of Motion for a New Trial that the United States should be sanctioned for untimely filing its response.  Doc. 226, Reply ISO Mot. for New Trial, at 1.

As stated above, granting a Rule 33 motion is a form of extraordinary relief that upsets the verdict of a sitting jury.  *See Gori*, 367 U.S. at 367–71 (discussing the appropriateness of a trial court setting aside a jury verdict in a criminal case).  The Second Circuit has explained that Rule 33 is necessary because there are rare occasions where legitimate fears that errors in the way a trial proceeded led to a legitimate belief that "an innocent person may have been convicted."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quotations omitted).  Because Rule 33 balances the seriousness of the accusation that errors in the trial process have led to the conviction of an innocent person with the need for finality in judgment and the constitutional concerns raised by the retrial of a defendant, Rule 33 places the parties under strict deadlines.  For example, a defendant must raise her motion within two weeks of the conclusion of trial.  FED. R. CRIM. P. 33.  Courts frequently hold that a failure to timely file a motion constitutes a waiver of argument for the purposes of Rule 33 that can preclude even an innocent defendant from relief.  *See, e.g.*, *United States v. Higgins*, 282 F.3d 1261, 1278 (10th Cir. 2002).

Here, Mr. Thomas timely filed his Rule 33 motion on May 6, 2016.  Doc. 222, Mot. for New Trial.  However, the United States did not timely file their papers in opposition or request leave of the Court for an extended briefing schedule.  *See* Doc. 224, Opp. to Mot. for New Trial; Doc. 226, Reply ISO Mot. for New Trial, at 1.  Instead, the United States chose to untimely file its opposition in violation of Federal Rule of Criminal Procedure 45 and United States District

Court for the District of New Mexico Rule 47.8. FED. R. CRIM. P. 45; D.N.M.LR-Cr 47.8(a) (2012). Given that the Court has already chastised the United States for its failure to follow a Court order in this case, Doc. 223, Partial Transcript of Proceedings, at 1–37, and that Mr. Thomas bases his motion primarily on grounds of prosecutorial misconduct, *see generally* Doc. 222, Mot. for New Trial, the Court is astonished that the United States failed to abide by the rules of this Court and timely file its motion opposing Mr. Thomas's allegations.

Here, the United States is asking for the Court to apply a double standard. Failure to abide by the strict deadline specified in Rule 33 *by a defendant* can foreclose the possibility of relief, even in a case of clear innocence, *see Higgins*, 282 F.3d at 1278, therefore failure to abide by the same schedule must also have consequences for the United States. However, because the Court is prepared to rule against the United States based on a full and fair consideration of the United States' untimely briefing, as explained above, the Court need not decide at this time what, if any, sanctions are appropriate. Based on the foregoing analysis, Mr. Thomas's Motion to Strike the United States' Response is DENIED as MOOT.

## CONCLUSION

For the foregoing reasons, the Court holds that the substantial weight of the evidence indicates that the jury reached the wrong verdict in this case and therefore the Court is obligated to grant a new trial. The Court further holds that the prosecution, the defense, and this Court all committed errors that cumulatively prejudiced the jury in reaching this erroneous verdict and further obligate the Court to grant a new trial. Finally, the Court notes that many of these errors could individually form the basis of a reversal of the verdict which additionally obligates this Court to grant a new trial.

Because Section III of this ruling is based on the "cumulative error" doctrine and because an alternative basis for granting the Rule 33 motion is present in this case, the Court does not find it necessary to make any specific finding of error that rises to the level of prosecutorial misconduct and therefore expressly abstains from doing so at this time.  Furthermore, because this ruling has mooted Mr. Thomas's requested relief in his motion for sanctions against the United States, the Court finds it unnecessary to impose sanctions on the United States for the prosecution's untimely filing, even though the same action, if committed by counsel for the defense, would probably have barred Mr. Thomas from relief and may have constituted ineffective assistance of counsel.

**IT IS THEREFORE ORDERED** that Defendant Roberto Thomas's Motion for New Trial [Doc. 222] is **GRANTED**.  Defendant Roberto Thomas's Motion to Strike [Doc. 226] is **DENIED as MOOT**.

Dated this 5th day of August, 2016.

**MARTHA VÁZQUEZ**
UNITED STATES DISTRICT JUDGE